# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Benjamin McClure, | No. CV-15-02597-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Country Life Insurance Company, et al., | |
| Defendants. | |

Following a ten-day trial in September 2017, the jury returned a verdict in favor of Plaintiff Benjamin McClure on his breach of contract and insurance bad faith claims. The jury found that Defendants Country Life Insurance Company ("Country Life") and CC Services Incorporated ("CCS") were jointly liable for the conduct of the insurance adjusters handling Plaintiff's claim. On the breach of contract claim, the jury awarded Plaintiff $23,469.35 for policy benefits and $1,245.74 for un-refunded premiums. On the bad faith claim, the jury awarded Plaintiff damages in the amount of $1,290,000.00 for emotional distress, humiliation, inconvenience, and anxiety; $45,000.00 for the loss of enjoyment of life; and $173,593.76 for policy benefits for the period in which the Plaintiff will be totally disabled in the future. The jury also awarded punitive damages in the amount of $2,500,000.00 against each defendant.

Before the Court is Defendants' motion for new trial pursuant to Federal Rule of Civil Procedure 59 (Doc. 404), which includes a request relief pursuant to Rule 50

regarding the jury's finding that Defendants were operating as a joint venture. The Court heard oral argument on July 10, 2018, and received supplemental briefs shortly thereafter. (Docs. 420, 424.) For reasons stated below, Defendants' motion is granted in part and denied in part.

**I. Background**

Country Life issued a Disability Income Policy ("the Policy") to Plaintiff in 1995. In late November 2012, Plaintiff suffered a head injury, was diagnosed with a concussion, and found by his doctor to be unable to work. Country Life accepted his claim for disability under the Policy in March 2013. Country Life paid Plaintiff's claim for about thirteen months, but terminated it on April 23, 2014. After Plaintiff filed this action, Country Life reconsidered its termination and agreed to pay benefits dating back to June 16, 2014. Although Country Life reinstated benefits, it continued to deny Plaintiff's disability claim for the period between April 23, 2014 and June 16, 2014.

At trial, Plaintiff contended that he was disabled because of severe depression and that, Country Life and CCS (acting jointly) terminated his claim without a reasonable basis and adequate investigation, ignored medical facts that supported the claim, and misinterpreted medical facts to their advantage. Plaintiff also contended that he was especially vulnerable and susceptible to emotional injury, and that the bad faith termination of benefits exacerbated his depression, resulting in extreme emotional distress and suicidal ideations for which he was hospitalized a number of times.

Plaintiff presented evidence that CCS employed all those at Country Life with responsibility for handling Plaintiff's claim, and that Country Life controlled the conduct of the CCS employees. Defendants maintained that they were not operating as a joint venture, did not act in bad faith, and had a reasonable basis for terminating Plaintiff's claim.

Defendants seek a new trial on the ground that prejudicial errors on material issues unfairly distorted the evidence, resulting in jury confusion and determinations based on passion or prejudices as opposed to the evidence and instructions. Plaintiff responds that

the evidence was fairly presented, Defendants' motion argues facts rejected by the jury, and allegations that the jury was confused and its verdict was based on passion or prejudice are conclusory.

## II. Standard of Review

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). For example, a court may order a new trial if the verdict is "against the great weight of the evidence" or if "it is quite clear that the jury has reached a seriously erroneous result." *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987) (internal quotations and citation omitted). In making such a determination, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). However, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Id.* (internal quotation and citation omitted).

## III. Discussion.

### A. Limitations on Defense Expert's Testimony

Defendants called Ms. Roberts as a trial witness to opine as an expert on bad faith. After Defense counsel laid the foundation for Ms. Roberts' qualifications, counsel for Plaintiff conducted a "voir dire" of her, which revealed that Ms. Roberts' definition of insurance bad faith was not consistent with the definition utilized by Arizona courts. Plaintiff then made an untimely challenge to Ms. Roberts' testimony under Federal Rules of Evidence 702(c) and (d). Despite the untimeliness of the challenge, the Court considered it on its merits. After reviewing the witness's deposition, the Court found that her definition of bad faith was inconsistent with Arizona law. The Court ruled that she could not opine that Defendants' conduct amounted to good faith or bad faith because

such opinions either were not the product of reliable principles or did not reliably apply the principles. (Trial Tr. at 1411:2-5.) The Court also ruled, however, that Ms. Roberts could testify about the Country Life procedures used to prevent bad faith, and that she could give her opinions on whether Country Life acted reasonably in adjusting the claim. (Trial Tr. at 1319:7-15.)

The objective of the trial court's gatekeeping function, described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is

> to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. . . . [T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). Defendants have not shown that the Court erred in limiting Ms. Roberts' testimony as part of its gatekeeping role. This case turned on Arizona law governing bad faith claims. Because Ms. Roberts' definition of bad faith differed from that of Arizona courts, any opinions she could offer on whether Defendants' conduct amounted to bad faith would not have been reliable.

Ms. Roberts' opinions on whether Defendants acted in bad faith also were inadmissible because they were opinions on an ultimate issue of law. Although Rule 704 provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir.2002), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014). Similarly, instructing the jury on the applicable law "is the distinct and exclusive province" of the court. *United States v. Weitzenhoff,* 35 F.3d 1275, 1287 (9th Cir.1993) (internal quotations and citation omitted).

Limiting Ms. Roberts' opinions did not prejudice Defendants. Ms. Roberts was

allowed to give all of her relevant and otherwise admissible opinions. She testified that Country Life acted reasonably in the adjustment of Plaintiff's claim; that County Life's claims handling process was reasonable; and that Country Life's process reasonably provided for the claims to be investigated, facts compared to the policy, damages documented, medical reports reviewed when received, and a nurse to help interpret the records. (Trial Tr. at 1322:11-1323:11.)

Ms. Roberts addressed Plaintiff's accusations that Defendants' investigation was inadequate. She testified that the investigation was reasonable despite the failure to obtain certain hospital records because the hospital records were irrelevant. She explained that adjusters are not required to do a "scorched earth to obtain every scrap of medical information about a claimant." (Trial Tr. at 1323:13-1324:8.) She testified that the adjusters acted reasonably when they made the payments timely and when, without prompting, they advised Plaintiff that he no longer had to pay premiums after he had been on disability for a certain period. She testified that, contrary to Plaintiff's assertion, the decision to require Plaintiff to undergo an independent medical examination ("IME") was reasonable and that Plaintiff's contention that the adjuster should have called Plaintiff's treating physicians was unheard of. Ms. Roberts explained, "I've never known an adjuster to call a physician directly" and opined that it was reasonable for the adjusters not to attempt to talk to Plaintiff's physicians. (Trial Tr. at 1324:9-1326:11.) She testified to the reasonableness of Country Life's decision to reinstate benefits when it did. Ms. Roberts also was not precluded from rebutting the opinions of Plaintiff's expert, Ms. Fuller, whose analysis and opinions Ms. Roberts criticized. (Trial Tr. at 1331:1-1332:10.)

Defendants identify four opinions that they claim Ms. Roberts was prejudicially precluded from offering. The Court's ruling was narrow, however, and based on the witness's misunderstanding of the applicable definition of bad faith. The Court precluded none of the four opinions Defendants identify. Had these four opinions been offered, however, they would have been inadmissible for reasons other than Rule 702(c).

Ms. Roberts' opinion that there was no evidence that the claims adjuster was financially motivated to harm Plaintiff is not a proper expert opinion. Fed. R. Civ. P. 702(a). A jury can make its own determination of whether financial incentives motivated a certain action without the assistance of expert witness testimony. Likewise, Ms. Roberts' opinion that any wrongful termination of claim benefits must have been a mistake because she found no indication of any intent to harm Plaintiff is not relevant, nor would the opinion have been helpful to the jury. Ms. Roberts' opinion that people are not perfect and make mistakes, which in her experience rarely constitutes bad faith, is irrelevant, not helpful to the jury, and amounts to a legal conclusion. Finally, Ms. Roberts' opinion that case law does not require an insurer to prevent all harm and that an insurer should not be liable because of a good faith mistake in judgment so long as it acts honestly, addresses an ultimate issue of law and is an opinion that would not be helpful to the jury. Indeed, any point intended to be made by this opinion was adequately covered by the jury instructions.

Defendants additionally argue that the Court should have limited Plaintiff's trial time, as it advised it would after the untimely challenge to Ms. Roberts' opinions. Defendants do not argue legal error or prejudice. Defendants' initial representation to the Court about the time needed to present their evidence was incorrect. Because the defense did not need the amount of trial time the Court initially was lead to believe was needed, the Court found that it was not necessary to assess against Plaintiff's allotted time the delay occasioned by the untimely challenge to Ms. Roberts. Defendants had ample time to present their case and therefore were not prejudiced. (Trial Tr. at 1365:14-24; 1415:11.) Defendants also complain that the curative instruction given to the jury was inadequate to cure the perceived error of not letting Ms. Roberts opine on whether Defendants acted in bad faith. The instruction the Court gave was proposed by Defendants and agreed to as modified. (Trial Tr. at 1567:4-10.) The instruction was not intended to address the limits on Ms. Roberts' opinions; it was intended to address any negative perceptions by the jury from the "voir-dire" that occurred during her direct

examination.  The instruction was adequate for its intended purpose and Defendants were not prejudiced.

### B.  The Emotional Distress Award

Defendants argue that there was insufficient evidence that they caused Plaintiff significant emotional distress.  Defendants argue that the jury's award had to have been based on improper speculation because there were no medical records and no medical testimony stating that his worsening condition was caused by Defendants' decision to terminate his benefits.

Plaintiff bears the burden of proof on the issue of proximate cause.  Under Arizona law, "[t]he proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred."  *McDowell v. Davis*, 448 P.2d 869, 871 (Ariz. 1968) (internal quotations and citation omitted), *superseded on other grounds by statute as stated in Cheney v. Ariz. Super. Ct. for Maricopa Cty.*, 698 P.2d 691 (Ariz. 1985).  Defendants' act or omission need not be a "large" or "abundant" cause of the injury; even if Defendants' conduct contributes "only a little" to Plaintiff's damages, liability exists if the damages would not have occurred but for that conduct.  *Ontiveros v. Borak,* 667 P.2d 200, 205 (Ariz. 1983).  Plaintiff need only present probable facts from which the causal relationship reasonably may be inferred.  *Purcell v. Zimbelman*, 500 P.2d 335, 342 (Ariz. Ct. App. 1972).

Defendants cite no authority for their suggestion that proof of causation under the facts of this case required expert testimony or reference in medical records.  The causal relationship between Defendants' conduct and Plaintiff's emotional distress could have been readily apparent to the trier of fact.  The testimony of those familiar with Plaintiff, his situation, and the effects the termination of benefits had on him was sufficient evidence from which a jury could infer that Plaintiff's emotional stress was brought about by Defendants' conduct.

For example, the jury heard the chronology of events.  Plaintiff, who was totally

disabled and unable to work, had his benefits terminated for almost two years before they were partially reinstated after he hired a lawyer and filed suit. Plaintiff, his wife, Brandon Figg, and Dr. Turner testified about the stress Plaintiff experienced and that they observed him experience resulting from the termination of benefits. The witnesses' testimony painted a picture of emotional pain brought on by the uncertainties of the family finances and of their future, resulting from the termination and the coverage battle with Defendants, all of which came at a time when Plaintiff was vulnerable and experiencing severe depression. There was sufficient evidence from which the jury could infer that Plaintiff's preexisting emotional distress was aggravated by the stress and humiliation of having to rely on the charity of friends.

Defendants challenge the amount of the award, claiming it had to be based on improper motives when it is viewed against awards in other cases. Defendants argue that the award here is not justified because the emotional distress was not severe and permanent, suggesting that others in Plaintiff's situation would not have suffered severe emotional distress. But there was ample evidence supporting the jury's verdict for emotional distress. The evidence showed that Plaintiff was suffering from a preexisting condition and that Defendants' bad faith termination of his claim made his condition worse. The jury verdict was consistent with the "Pre-Existing Condition, Unusually Susceptible Plaintiff" jury instruction, which instructed the jury, in relevant part, as follows:

> [I]f Mr. McClure had any preexisting physical or emotional condition that was aggravated or made worse by Country Life's fault, you must decide the full amount of money that will reasonably and fairly compensate Ben McClure for that aggravation or worsening. . . . even if Mr. McClure was more susceptible to injury than a normally healthy person would have been[.]

(Doc. 384 at 34.)

Defendants' argument that the stress was not permanent because they resumed Plaintiff's benefits is without merit. The emotional distress, depression, and anxiety caused by Defendants' bad faith conduct did not turn on and off like a water hose. There

was sufficient evidence for the jury to find that Plaintiff's emotional condition was aggravated by Defendants' actions and that he continued to live in the aggravated state well after the benefits resumed.

### C. Joint Venture Within the Corporate Family

Defendants request Rule 50 relief from the jury's finding that they were operating as a joint venture, but also argue that relief under Rule 59 would be appropriate for the same reasons. They argue that, as a matter of law, there can be no joint venture because Defendants are part of the same corporate family, wholly owned by Illinois Agricultural Holding Company.

Rule 50 relief is not available to Defendants because they did not raise this issue in their initial, pre-verdict Rule 50 motion. (Trial Tr. at 1255-65.) "The failure to raise this issue prior to the return of the verdict results in a complete waiver, precluding [the Court's] consideration of the merits of the issue." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028-29 (9th Cir. 2003); *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) ("A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.").

Even assuming there has been no waiver, or considering Defendants' request under the rubric of Rule 59, Defendants' argument fails on the merits. Defendants are separate entities. They enjoy the advantages of being separate, independent entities. The legal authority offered by Defendants, *Helfenbein v. Barae Investment Co.,* 508 P.2d 101, 104 (Ariz. Ct. App. 1973), does not support their argument. Defendants are not immunized from the jury's joint venture finding simply because they are part of the same extensive corporate family. Arizona courts have held that a third party administering claims, as was the case here, may be found to be engaged in a joint venture with the contracting insurer. *See, e.g., Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137-38 (Ariz. 1982); *Farr v. Transamerica Occidental Life Ins. Co. of Cal.*, 699 P.2d 376, 385-86 (Ariz. Ct. App. 1984).

## D. The Sufficiency of Evidence of a Joint Venture

Defendants argue that there is no evidence that they engaged in a joint venture. A joint venture requires "an agreement, a common purpose, a community of interest, and an equal right of control." *Sparks*, 647 P.2d 1127, 1138 (Ariz. 1982). There was evidence presented to support all of these requirements.

First, there was evidence of an agreement and common purpose for Country Life to issue the policies and received the premiums, and for CCS to provide the personnel who performed the claim handling responsibilities. (Doc. 309 at 4, ¶ K.)

Second, there was community interest in the shared bonus program. The bonus program for both Defendants shared the same objectives and both had a shared interest in Country Life's financial performance. Chad Carpenter, who is employed by CCS and manages the claims operation that handled Plaintiff's claim, testified that the bonus program for CCS employees is "based on the operating results from all the companies," including Country Life. (Trial Tr. at 1476:8-21.) CCS employees are updated about the financial results that impact their bonuses. They are encouraged to "make a positive impact" on those financial results, and reminded that "profitability" is a "measure [of] our progress." (Doc. 411-8.)

Indeed, Defendants' community of interest was such that they were treated as a single unit throughout the trial and employed the same lawyers in the defense of the case. Their community of interest was so close that Mr. Anderson, the in-house attorney who supervised and terminated Plaintiff's claim, was not even sure which company was his employer. (Trial Tr. at 1167:7-20); *see Ceimo v. Gen. Am. Life Ins. Co.*, No. 2:00-CV-1386 FJM, 2003 WL 25481095, at *1 (D. Ariz. Sept. 17, 2003) (finding the evidence "was more than sufficient" on alter ego and joint venture and denying the defendants' Rule 50(b) motion, considering "they not only retained the same lawyers, but were, for the most part, treated as a single unit throughout the trial"), *aff'd by* 137 Fed. App'x 968, 969 (9th Cir. 2005) ("A company may be liable to an insured based on its direct involvement in the insured's claim, regardless of its status as a non-party to the

contract.").

As for the final element, under Arizona law "equal right to control" does not mean that each venturer has "an equivalent amount of control over the venture's operation[.]" *Estate of Hernandez v. Flavio*, 930 P.2d 1309, 1313 (Ariz. 1977). Rather, "each joint venturer must share, to some extent, in the control of the venture. In other words, it is sufficient that a venturer has some voice or right to be heard in the control and management of the venture." *Id.* The evidence at trial showed that, although Country Life issued Plaintiff's disability policy and received his premiums, it was CCS that performed all claim handling responsibilities and denied Plaintiff's claim. (Doc. 309 at 4, ¶ K.)

Further, *Farr* indicates that the right of control can be established by the nature of the relationship. Relying on *Sparks*, the *Farr* Court explained:

> *Sparks* turns upon the idea that the insurer and its agent are engaged in a joint venture so that each is jointly and severally liable with the other for a bad faith refusal to pay. . . . [W]e note that here there was no proof of profit and loss sharing and no proof of a joint right to control. Thus, the classical elements of a joint venture are missing. But if that is true here, it was also true in *Sparks*. In *Sparks* the court found that a company that issued certificates of coverage, billed and collected premiums, handled the investigation and payment of claims, and distributed brochures to induce the purchase of policies was engaged in a joint venture with the insurer so that both owed a common duty to the insureds to act in good faith.

*Farr*, 699 P.2d at 386. Based on similar evidence, the jury reasonably found the existence of a joint venture here.

**E. The Evidence to Support an Award of Punitive Damages**

Defendants argue that there was not clear and convincing evidence of conduct by each Defendant to justify both punitive damage verdicts. In an insurance bad faith case, the plaintiff must prove "a willful and knowing failure to process or pay a claim known to be valid" to support an award of punitive damages. *Id.* at 383. The requisite mental state necessary to justify an award of punitive damages may also be shown with evidence of (1) fraud in connection with denying the claim, (2) "[d]eliberate, overt and dishonest

dealings," *Id.* at 383-84, and (3) other conduct that "is sufficiently oppressive, outrageous or intolerable," *Hawkins v. Allstate Ins. Co.*, 733 P.2d 1073, 1080 (Ariz. 1987) (internal quotations and citation omitted). *See also Rawlings v. Apodaca*, 726 P.2d 565, at 578 (Ariz. 1986) (concluding that conscious disregard of significant harm to insured warrants punitive damages). The "clear and convincing" proof of the mental state necessary for punitive damages often comes "from defendant's expressions, conduct, or objectives," and other "indirect and circumstantial evidence." *Thompson v. Better-Bilt Aluminum Prod. Co.*, 832 P.2d 203, 210 (Ariz. 1992) (internal quotations and citation omitted).

Plaintiff presented evidence at trial from which the jury could conclude that Country Life terminated a claim it knew was valid. The evidence indicated that when Country Life, acting through CCS employees, terminated the claim in April 2014, it knew: (1) the medical evidence and Plaintiff's treating doctors supported the claim up to that point, (2) there was no basis to question or reject their opinions, (3) Country Life did not question the validity of Plaintiff's depression and anxiety, (4) the IME was "inconclusive" at best and actually verified continuing depression, and (5) Dr. Borgaro's testing in December 2013 revealed "severe depression" on the PAI test, supporting this claim.

Defendants argue that "there would not have been clear and convincing evidence of an evil mind had Ms. Roberts been permitted to testify in full." As discussed above, however, the limitation placed on Ms. Roberts' testimony prevented her only from rendering a legal opinion on whether Defendants' conduct amounted to bad faith. She was allowed to and did testify on all other subjects, including the reasonableness of Defendants' conduct, and her challenges to Plaintiff's expert and Plaintiff's accusations about the adequacy of the investigation.

Defendants argue that there was no evidence they acted with the requisite mental state because the termination of benefits was a mistake. The evidence showed, however, that Defendants essentially ratified the termination in November 2016, and the adjuster who made that decision, Spellmeyer, testified that she would make the decision again

today.

Defendants argue that Plaintiff presented no evidence that they unjustly disregarded a substantial risk of harm to him. Adjuster Spellmeyer, however, admitted to knowing that Plaintiff suffered from major depressive disorder and panic attacks, that she was aware that Plaintiff's treating doctors believed he continued suffering disabling depression, and the there was no basis to reject their opinions. (Doc. 359-3 at 8, 13, 17, 29.) Spellmeyer knew both Dr. Strupinsky's and Dr. Borgaro's IME reports specifically indicated Plaintiff continued to suffer from depression, was anxious over his lack of income, and was struggling emotionally—having been hospitalized as suicidal. Both Spellmeyer and Anderson knew that Plaintiff could be sent into the severely impaired range when anxious. (Trial Tr. at 982:24-983:10; Doc. 359-3 at 19.) Spellmeyer admitted knowing that terminating disability benefits could be devastating. (Doc. 359-3 at 8.) There was sufficient evidence for the jury to find that Defendants terminated benefits knowing that the medical evidence supported the claim and knowing the risks of the devastating consequences of terminating benefits.

Additionally, there was evidence that Defendants misrepresented the medical evidence to justify the termination of benefits. For example, there was evidence of a misrepresentation that occurred in the termination letter when Spellmeyer told Plaintiff that his treating doctors did not document "any loss of physical/mental health function." There also was evidence that Spellmeyer knew Plaintiff's doctors continued to support disability. County Life also knew Dr. Borgaro's December 2013 IME report revealed severe depression on the PAI test and Strupinski's IME showed continuing depression and anxiety. *See, e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1010-11 (9th Cir. 2004) (noting that letter terminating benefits could be found misleading and deceptive); *Verhulst v. Gen. Am. Life Ins. Co.*, No. CV-03-0858-PCT-JAT, 2005 WL 2371860, at *5 n.4, 7 (D. Ariz. Sept. 26, 2005) (allowing punitive damages to be considered at trial where insurer misrepresented that the treating doctor believed the insured was "stable").

The evidence of oppressive and outrageous conduct included the intentional creation of financial conflicts of interest for claims staff. For example, there was evidence that financial conflicts created incentives for claims adjusters to look for ways to terminate Plaintiff's claim. Ms. Fuller explained how Defendants' bonus and incentive pay plans make claim handlers inappropriately accountable for contributing to the achievement of financial goals. (Trial Tr. at 359-60.) Company documents conveyed that everyone should be focused on meeting the financial objectives, including those in the claim operation, and personal interests are aligned with meeting the corporate financial goals. (Trial Tr. at 360-61.) Ms. Fuller explained that it is inappropriate, however, to ask those making decisions on claims to be focused on company financial objectives. (Trial Tr. at 361, 369-70.) She testified that claim handlers can influence profitability only by rejecting new claims or terminating claims that are already in pay status. (Trial Tr. at 368-69.) Therefore, tasking claims personnel with concerns about company profits inappropriately places them in an inherent conflict of interest. By creating a financial incentive to wrongfully terminate claims, adjusters can be motivated to avoid their responsibility to treat insureds equally and honor all legitimate claims. (Trial Tr. at 245.) Ms. Fuller testified that Defendants' bonus arrangement encouraged adjusters to deny and terminate claims, and that in her opinion the financial performance of the company should not bear on how the claims organization is operated. (Trial Tr. at 361.)

Lastly, the evidence demonstrated that, in the early months of 2014, the year Plaintiff's claim was terminated, Country Life was experiencing much higher new claim activity and higher reserves. (Trial Tr. 362-67.) Reserves released from terminated claims began increasing in April 2014. (Trial Tr. 368.) In sum, the evidence was sufficient to support a finding that Country Life acted dishonestly to serve its own interests.

**F. Separate Punitive Damages Against Each Defendant**

Defendants argue that an award of punitive damages against each is improper

because there was no evidence that each Defendant acted with the request mental state. Defendants further argue that they cannot be held individually responsible for the acts of the claims adjusters because there no evidence establishing for which Defendant the adjusters were acting. Defendants argue that two punitive damages awards show that the jury was both confused and inflamed by passion.

Defendants' arguments fail to recognize that, under Arizona law, a principal may be held responsible for punitive damages for the conduct of its agent without any showing of the principal's mental state. *Mendoza v. McDonald's Corp.*, 213 P.3d 288, 305 (Ariz. Ct. App. 2009); *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 907 P.2d 506, 516 (Ariz. Ct. App.1995); *see also Haralson v. Fisher Surveying, Inc.*, 31 P.3d 114, 119-20 (Ariz. 2001) (rule in Arizona is that punitive damages may be awarded against employer for acts of employee as long as acts committed in furtherance of employer's business and within scope of employment); *Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 633 (Ariz. 1982).

Defendants argue that Plaintiff had not pled or presented to the jury the theory of vicarious damages for punitive damages. The entire case, however, was premised on respondeat superior liability. No individual employee was named as a defendant, although it was the individual adjusters' conduct that formed the basis of Plaintiff's claims. The jury was instructed, without objection, that "a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority." (Doc. 384 at 17.)

In support of their argument that the respondeat superior theory was not previously introduced, Defendants point to the failure to give the Revised Arizona Jury Instruction for respondeat superior liability. The instruction the Court gave, however, is a portion of that Arizona instruction. The Use Note accompanying the Revised Arizona Jury Instruction states that the portion of the respondeat superior instruction that the Court gave here is to be used "if there is no dispute about the existence of respondeat superior liability." The Use Note also indicates that the second portion of the instruction, which

the Court did not give, is to be used "if there is a dispute about the existence of respondeat superior liability." There was no dispute during trial about respondeat superior liability and there was no request by Defendants for the second portion of the instruction to be given.

Because the jury found that Defendants were acting as a joint enterprise, with equal right of control, an award of punitive damages against each as a result of the actions of the employees working for the joint enterprise is allowed. "The reason for allowing punitive damages against the corporation is the supposed deterrent effect. Indeed, "[t]he reason for allowing punitive damages against the corporation is the supposed deterrent effect. The allowance of such damages will encourage employers to exercise close control over their servants for the prevention of outrageous torts." *State v. Sanchez*, 579 P.2d 568, 570 (Ariz. Ct. App. 1978); *see also Wilson v. Riley Whittle, Inc.*, 701 P.2d 575, 580-81 (Ariz. Ct. App. 1984).

Defendants' arguments that Plaintiff failed to prove which Defendant employed the culpable employees and that Plaintiff did not allege an aiding and abetting claim are not relevant in light of the finding by the jury of the existence of a joint enterprise. The finding of a joint venture also eliminates Defendants' concern that there was no "common employee" inquiry. There was no need to determine whether a general employer remained vicariously liable for the acts of employees it has contracted out to another. Where a joint venture exists, each of the parties is the agent of the other and each is likewise a principal of the other "so that the act of one is the act of all." *West v. Soto,* 336 P.2d 153, 157 (Ariz. 1959).

The separate assessment of punitive damages does not indicate that the jury was confused or inflamed by passion. The Court finds that the punitive damages were not excessive nor was the jury confused by the evidence or the instructions. The instructions advised the jury that the determination of joint liability is independent of its assessment of punitive damages, and that, if assessed, punitive damages shall be assessed as to each Defendant separately. The jury, following those instructions, arrived at a separate

punitive damage verdict for each Defendant. The acts and conduct of each company's employees and agents form the basis of a punitive damage award as to each company. Although Country Life delegated the duty of adjusting the claim to adjusters employed by CCS, it remained liable for the actions taken by those adjusters because the duty of good faith is not delegable. *Walter v. F.J. Simmons & Others*, 818 P.2d 214, 222 (Ariz Ct. App. 1991). Relatedly, because the jury found that Country Life and CCS were engaged in a joint venture, the act of one is the act of both. With these principals in mind, the jury's separate punitive damages awards are consistent with the deterrence goals underlying such damages.

## G. Exhibit 55

At trial, Plaintiffs offered Exhibit 55, a Certified Copy of the Annual Statement of Country Life Insurance Company for the year 2016 filed with the Arizona Department of Insurance, to show Country Life's net worth. (Doc. 404-3.) A company's net worth, defined as "'the excess of total assets over total liabilities,' can readily be calculated by reference to its financial statement[.]" *Metro. Bus. Mgmt., Inc. v. Allstate Ins. Co.*, No. CV 05-8306CAS (CWX), 2009 WL 2424291, at *3 (C.D. Cal. Aug. 6, 2009) (internal quotations and citation omitted), *aff'd,* 448 F. App'x 677 (9th Cir. 2011).

Defendants objected to the exhibit's admission, arguing that it is confusing and is irrelevant without explanation. Defendants do not argue that Exhibit 55 lacked authentication or that the information contained in Exhibit 55 is irrelevant *per se*, but instead that it is irrelevant without context. The Court agreed that some of the information could be confusing, but concluded that that the relevant portions—the total assets and total liabilities—were not confusing and did not require testimony in order to be understood by a jury. (Trial Tr. at 1519:15-1526:16.) When Exhibit 55 was allowed into evidence, Plaintiff's counsel therefore was limited to addressing only total assets and liabilities.

Although Defendants argue that they were prejudiced because Exhibit 55 was admitted without testimony that gave context to the numbers contained in the exhibit,

they do not explain what additional information or context was necessary for the jury to understand what is meant by total assets and total liabilities. Exhibit 55 was relevant and not unfairly prejudicial to Defendants. The information in Exhibit 55 allowed a calculation of Country Life's net worth (total assets minus total liabilities) and did not require explanation to be understood by the jury.

**H. The Ratio of Compensatory to Punitive Damages**

Defendants argue that the jury must have acted with passion and prejudice and that the punitive damages awards exceed constitutional limits because the ratio of punitive damages to compensatory damages is greater than one. Defendants' argument is predicated on their belief that there was no evidence that their conduct was reprehensible. Even if Defendants were correct that their conduct was not reprehensible, however, the ratio of punitive to compensatory damages neither shows that the jury acted out of passion or prejudice nor exceeds constitutional limits. The jury award of $2.5 million for punitive damages is less than twice the awarded compensatory damages of $1,463,638.76. The ratio of punitive damages to compensatory damages, 1.7:1, therefore is well with constitutionally permissible limits. *See Planned Parenthood of Columbia/Willamette Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005).

Moreover, the premise of Defendants' argument is not supported by the evidence. There was substantial evidence to support a finding that Defendants' conduct was reprehensible. The evidence showed, for example, that Defendants were indifferent to Plaintiff's health and safety. Defendants improperly terminated Plaintiff's benefits without proper investigation and despite his financial vulnerability, fragile emotional health, suicidal ideations, and the knowledge that additional stressors could worsen his health. There was evidence that some of the bad faith practices utilized against Plaintiff were practices used by Defendants in the past. (Trial Tr. at 342:2-25.) The harm caused to Plaintiff was immense. Plaintiff spiraled into further depression and suicidal thoughts leading to hospitalization after Defendants terminated his benefits.

## I.  Breach of Contract Award for Retroactive SIR Benefits

The parties agree that the jury awarded retroactive SIR benefits, considering the amount of the award ($23,469.35).  The parties also agree that a verdict for retroactive SIR benefits as damages for Plaintiff's breach of contract claim is inconsistent with the Court's ruling on Defendants' pre-verdict Rule 50(a) motion.  The Court had ruled that Plaintiff could not seek retroactive SIR benefits as contractual damages, but could seek those damages as part of his bad faith claim.  The jury, however, found that Plaintiff suffered no such damages as a result of a breach of good faith and fair dealing.

Plaintiff argues that Defendants have waived any objection to the damage award because they did not provide the jury with an opportunity to clear up the inconsistency by raising the issue before the jury was released.  Defendants argue that their failure to object is irrelevant because the verdicts were not internally inconsistent.

The Court agrees that this is not a case where the verdicts were internally inconsistent.  The subject damages are not allowed as contract damages as a matter of law.  The Court had previously granted Defendants' Rule 50 motion and ordered that those damages could be pursued under a theory of bad faith, but not as a remedy for breach of contract.  Because the Court granted the Rule 50 motion precluding those damages for breach of contract, there is no basis supporting the jury's award of them. The jury found that the there were no bad faith damages for the retroactive SIR benefits. The Court therefore reaffirms its Rule 50 ruling and finds as a matter of law that the jury award of $23,469.35 for the policy benefits that Plaintiff would have received through the date of the trial is vacated.

## J.  Evidentiary Rulings

Defendants claim the Court erred by allowing the jury to consider punitive damages against CCS because there was no evidence of its wealth.  Defendants do not identify any point during trial or arguments on jury instructions or verdict forms where such an objection was raised.  Any such objection therefore has been waived.

Defendants argue that the Court erred by admitting Exhibit 94.  Defendants'

medical expert, Dr. Hendin, who has been performing IMEs since at least the early 1990s (mostly for insurance companies and defense attorneys), was asked to verify that, between 2008 and 2012, his office collected $2.4 million for those exams. When he stated that he could not verify that amount, Plaintiff offered Exhibit 94, an affidavit signed by Dr. Hendin's partner setting forth information Dr. Hendin claimed he could not verify. Defendants objected that the exhibit was not proper impeachment. The Court overruled Defendants' objection, however, and allowed the exhibit into evidence to show that the witness had a potential financial motive or bias. Defendants have not shown that the Court abused its discretion by allowing the admission of Exhibit 94, or that its admission was prejudicial.

Without identifying a rule of evidence, Defendants raise a new objection to Exhibit 94. Defendants claim that the line of questioning was inappropriate because Dr. Hendin did not have personal knowledge of the exact amount of money made by his firm's performance of IMEs, even though that number was set forth in Exhibit 94, a document Dr. Hendin conceded was authored by his partner. (Trial Tr. at 778-82.) Defendants' new objection is waived, as it was not raised at trial. Regardless, the exhibit was relevant and otherwise properly admitted.

Defendants argue that the Court favored Plaintiff in permitting Dr. Zacarri to offer opinion and fact testimony beyond what Plaintiff timely disclosed, compounding the error and prejudicial effect by admitting objectionable records from this witness. Dr. Zacarri provided ongoing counseling services to Plaintiff and his family. Plaintiff had disclosed Dr. Zacarri as a provider who was providing ongoing counseling. Plaintiff had difficulty obtaining Dr. Zacarri's records, but disclosed them soon after obtaining them. After exploring the reason for the delayed disclosure and the contents of the records, the Court allowed them into evidence, finding that the delayed disclosure was substantially justified due to fact that Plaintiff notified Defendants that Dr. Zacarri was an ongoing treating medical provider and had made reasonably timely efforts to gather the records. The Court further found that allowing the late disclosed documents into evidence was

harmless. (Trial Tr. at 845-46.) Although Defendants argue that the late disclosure should not have been allowed, they do not argue that the Court was incorrect or that it abused its discretion when it found that the late disclosure was substantially justified and harmless.

Finally, Defendants challenge three rulings on objections to Ms. Fuller's testimony and the admission of Exhibit 92. Regarding the objections to Ms. Fuller's testimony, based on the portions of the record cited in Defendants' motion, Defendants have not shown that the Court's rulings were incorrect or an abuse of discretion. As to the objection to the admission of Exhibit 92, Defendants have not cited the testimony, objection, or arguments that occurred at the time of the exhibit's admission. The Court will not search the entire record. Defendants present nothing to show that the Court improperly admitted the exhibit or that the admission was prejudicial. Accordingly,

**IT IS ORDERED** that Defendants' motion (Doc. 404) is **GRANTED IN PART AND DENIED IN PART**. The Court reaffirms its prior ruling granting Defendants' Rule 50 motion on the availability of retroactive SIR benefits as a damage for Plaintiff's breach of contract claim. Consequently, the jury award of $23,469.35 as damages for breach of contract is vacated, as those damages are contrary to law and inconsistent with the Court's prior ruling. The remainder of Defendants' motion, including their request for a new trial, is denied.

Dated this 8th day of August, 2018.

Douglas L. Rayes
United States District Judge

- 21 -